ORDERED.

**Dated:  April 30, 2019**

Caryl E. Delano
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION
www.flmb.uscourts.gov

In re:                                                          Case No. 9:14-bk-00965-FMD

WILLIAM P. McCUAN,                          Chapter 7
      Debtor.
_____/

REGIONS BANK and                            Adv. Pro. No. 9:14-ap-402-FMD
ROBERT E. TARDIF, JR., Trustee,
      Plaintiffs,
v.

MDG LAKE TRAFFORD, LLC, *et al.*,
      Defendants,
and

JILL McCUAN, *et al.*,
      Impleaded Third-Party Defendants.
_____/

ROBERT E. TARDIF, JR., Trustee,          Adv. Pro. No. 9:16-ap-080-FMD
      Plaintiff,
v.

JILL McCUAN, *et al.*,
      Defendants.
_____/

**CONSOLIDATED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**THIS MATTER** came before the Court for trial on June 5, September 11-12, and October 15, 2018, in these consolidated adversary proceedings (the "Proceedings").[1] Plaintiffs in Adv. Pro. No. 9:14-ap-402-FMD (the "56.29 Proceeding") are Regions Bank, N.A. ("Regions") and Robert E. Tardif, Jr. (the "Trustee"), the Chapter 7 trustee for the bankruptcy estate of William P. McCuan ("Debtor"). The Trustee is the sole Plaintiff in Adv. Pro. No. 9:16-ap-080-FMD (the "Fraudulent Transfer Proceeding"). In the Proceedings, Plaintiffs seek judgments against (i) Jill McCuan, (ii) MJF Associates, LLP ("MJF"), (iii) the McCuan Irrevocable Trust ("McCuan Trust"), (iv) K&M Development Corporation, Inc. ("K&M"), and (v) McCuan Family, LLC ("McCuan LLC") (collectively, "Defendants").

Plaintiffs allege that Debtor made fraudulent transfers to Defendants in an effort to frustrate Regions in its collection of judgments against Debtor that totaled more than $14 million. In the 56.29 Proceeding, Plaintiffs seek judgment against Defendants under § 56.29 of the Florida Statutes; in the Fraudulent Transfer Proceeding, the Trustee seeks judgment against Defendants under § 544(b) of the Bankruptcy Code[2] and Chapter 726 of the Florida Statutes (the Florida Uniform Fraudulent Transfer Act, or FUFTA).

The Court, having reviewed the entire record in the Proceedings, finds that the transfers alleged by Plaintiffs are avoidable under § 56.29 and FUFTA, and that Plaintiffs are entitled to judgment against MJF, McCuan Trust, McCuan LLC, and K&M for the value of the transferred assets. However, in the absence of any evidence that Jill McCuan exercised control over or received any benefit from the transferred assets, and in accordance with the principles of equity that apply to

---

[1] *Agreed Order Consolidating Cases* - 56.29 Proceeding, Doc. No. 202; Fraudulent Transfer Proceeding, Doc. No. 32.
[2] Unless otherwise noted, cites to the United States Bankruptcy Code refer to 11 U.S.C. § 101, *et seq.*

actions under § 56.29, the Court finds that it would be inequitable to enter judgment against her. Accordingly, the Court enters the following findings of fact and conclusions of law.

## FINDINGS OF FACT

### A.    The Debtor and Defendants

Debtor filed a petition under Chapter 7 of the Bankruptcy Code on January 29, 2014. Prior to the petition date, Debtor was an owner and president of K&M, a Maryland entity incorporated in 1977. K&M developed projects as the managing member of various entities referred to collectively as the MDG Companies.

Nominal Defendant Ira Sugar ("Sugar") was Debtor's accountant and close advisor since the early 1970's. At the time of trial, Sugar was the president of K&M, and also directly or indirectly controlled other entities associated with Debtor, including McCuan LLC and MJF.

Debtor settled McCuan Trust in the 1980's. Sugar has been a trustee of McCuan Trust since its inception, and Debtor was a co-trustee of McCuan Trust from its inception until he died on August 20, 2017.[3]

Mrs. McCuan and Debtor were married from 1981 until Debtor's death. Mrs. McCuan has been the beneficiary of McCuan Trust since its inception.[4]

### B.    The Regions Debt

Regions' lending relationship with Debtor and his companies began in the early or mid-1990's. Regions was the companies' main source of financing. During most of the relationship, loans were extended, renewed, paid down, or rolled into new loans in the ordinary course of business.

Debtor guaranteed the Regions debt. In connection with his guaranty, Debtor submitted periodic financial statements to Regions that were used by Regions to underwrite loans and loan

---

[3] Doc. No. 266, ¶¶ 5-7.
[4] Doc. No. 266, ¶¶ 4, 6.

renewals. Because Mrs. McCuan did not guarantee Regions' loans, Regions required Debtor to provide, in addition to joint financial statements, segregated financial statements that reflected his separate, non-marital assets.[5]

In September 2008, Debtor and Sugar met with Regions to discuss restructuring the loans scheduled to mature in late 2008.[6] As part of the discussions, Debtor proposed a restructuring plan, but Regions rejected the proposal.[7] No payments on the loans were made after the September 2008 meeting.

On April 13, 2009, Regions served Debtor with a summons and complaint in an action styled *Regions Bank v. MDG Lake Trafford, LLC, et al.*, Case No. 09-3165-CA, in the Circuit Court for Collier County, Florida (the "Lake Trafford Action").[8] The Lake Trafford Action was one of five lawsuits filed by Regions to foreclose on its collateral and to enforce Debtor's guaranty.[9] Between May and June 2011, Regions obtained five judgments against Debtor in the aggregate amount of approximately $14,172,000.00.[10]

### C.     The Brown Accounts

Debtor's financial statement dated October 31, 2007, reflects that Debtor held a 100% interest in "cash and cash equivalents" with a value of $4,481,178.00, including three investment accounts at Brown Investment Advisory and Trust Company ("Brown"), identified as account numbers ending 6-06-1 ("Brown Account -1"), 6-01-2 ("Brown Account -2"), and 6-07-9 ("Brown Account -9")

---

[5] Doc. No. 321, June 5 Tr., pp. 75-78.
[6] Doc. No. 322, June 5 Tr., pp. 291-94; Pls. Ex. 2; Defs. Ex. 1. A Promissory Note for $3,500,000.00 with MDG Lake Trafford, LLC, for example, was dated December 31, 2007, with a Maturity Date of "twelve (12) months after the date hereof."
[7] Doc. No. 322, June 5 Tr., pp. 145, 175, 232, 293-94.
[8] Doc. No. 266, ¶¶ 16-17.
[9] Pls. Exs. 2-6.
[10] Doc. No. 266, ¶¶ 23, 25-27.

(together, the "Brown Accounts").[11] According to the October 31, 2007 financial statement, the $4,481,178.00 value represents Debtor's segregated value of the cash, as distinct from the full value of the assets held by Debtor and Mrs. McCuan.[12]

Debtor opened the Brown Accounts on July 1, 2001, in his individual name.[13] They were initially funded with Debtor's individual assets, including funds from a Merrill Lynch account in the name of "W. Patrick McCuan." Debtor used his Merrill Lynch account to continue to fund the Brown Accounts after they were initially opened. On January 4, 2005, for example, Debtor wrote a letter to Brown in which he stated:

> I have transferred $1,200,000 to Brown Advisory Group. $1,000,000 should go directly into the Patrick McCuan account and $200,000 to the Irrevocable Trust.
>
> An additional $1,000,000 will be coming into the Patrick McCuan account on or around January 25, 2005.

At the same time, Debtor instructed Jim Gaylor, his in-house corporate accountant, to "[p]lease arrange to have $1.2 million transferred from my Merrill Lynch account pursuant to the attached letter."[14]

Debtor acknowledged in deposition testimony admitted at trial that Brown Account -1 was his individual asset on June 30, 2008, and that the account was worth almost $1.12 million as of that date.[15] Debtor also acknowledged that Brown Account -2, which contained approximately $2.15 million, and Brown Account -9, which contained approximately $600,000.00, were his individual assets as reflected in statements for those accounts dated June 30, 2008.[16]

---

[11] Pls. Ex. 8.
[12] Pls. Ex. 8, pp. 13-16.
[13] Pls. Exs. 13, 20-21, 27, 33-34; Doc. No. 266, ¶ 11.
[14] Pls. Ex. 17.
[15] Doc. No. 322, June 5 Tr., p. 151 (discussing Pls. Ex. 21).
[16] Doc. No. 322, June 5 Tr., pp. 152-53 (discussing Pls. Exs. 27-28).

### D.    The SunTrust Line of Credit

On or about March 2, 2006, Debtor opened a $1,000,000.00 line of credit at SunTrust Bank, N.A. ("SunTrust"). Brown Account -1 was pledged as security to SunTrust.[17] In an Account Control Agreement related to the security interest, Brown represented and warranted to SunTrust that the Brown Account was established "in the name of W. Patrick McCuan" and that, "except for the claims and interest of SunTrust and [Debtor, Brown] does not know of any claim to or interest in" the account.[18]

On August 19, 2008, Debtor executed loan documents to increase the line of credit to $2.4 million, including a Commercial Note that stated that the loan was secured by Brown Accounts -1 and -2 (the "Collateral").[19] In the Investment Property Security Agreement related to the Commercial Note, Debtor represented and warranted that he was the sole owner of the Collateral, "free and clear of all liens, encumbrances, and adverse claims," with the "unrestricted right to grant the security interest provided for herein to SunTrust and has granted to SunTrust a valid and perfected first priority security interest in the Collateral free of all liens, encumbrances, transfer restrictions and adverse claims." And in the Account Control Agreement related to the Commercial Note, Brown again warranted that Brown Account -1 was "established in the name of" Debtor and that, "except for the claims and interest of SunTrust and [Debtor, Brown] does not know of any claim to or interest" in the Brown Account.[20]

---

[17] Doc. No. 266, ¶ 12; Pls. Ex. 51.
[18] Pls. Ex. 51.
[19] Pls. Ex. 53.
[20] Pls. Ex. 53.

E.    **The September 2008 Addition of Mrs. McCuan to the Brown Accounts and a BB&T Account**

On September 8, 2008, Debtor executed an Investment Advisory and Custody Agreement with Brown that added Mrs. McCuan to the Brown Accounts.[21] The new Agreement was made between Brown and "W. Patrick McCuan and Jill P. McCuan, tenants by the entireties." Debtor testified that Mrs. McCuan gave no consideration in exchange for having her name added to the accounts.[22]

Debtor and Sugar testified that Mrs. McCuan was added as an owner of the Brown Accounts at Sugar's advice.[23] Sugar testified that he recommended adding Mrs. McCuan to the accounts because while he and Debtor were discussing a business deal in August or September 2008, Sugar "happened to have seen" statements from Brown sitting on a table at Debtor's office and noticed that the Brown Accounts were titled in Debtor's sole name.[24]

However, in the course of advising Debtor, Sugar had seen Internal Revenue Form 1099's for the Brown Accounts for a number of years after they were opened in 2001. But despite his awareness of these tax forms, Sugar testified that he never thought to retitle the accounts until he saw the statement in Debtor's office in August or September of 2008.[25]

Debtor, on the other hand, testified that Sugar saw the Brown Account statements while Sugar was in Debtor's office specifically "doing some tax work" and was reviewing the statements "for tax purposes."[26] According to Debtor, "this was the time when he [Sugar] was preparing the tax returns, and in those [Brown] statements are tax information and we just simply turned them over to him."[27]

---

[21] Doc. No. 266, ¶ 14; Pls. Ex. 18.
[22] Doc. No. 322, June 5 Tr., p. 154.
[23] Doc. No. 322, June 5 Tr., pp. 157-58.
[24] Doc. No. 322, June 5 Tr., pp. 273-75.
[25] Doc. No. 325, Sept. 12 Tr., pp. 47-49.
[26] Doc. No. 322, June 5 Tr., pp. 172-73, 195.
[27] Doc. No. 322, June 5 Tr., pp. 195-96.

But Sugar denied receiving the account statements for tax purposes, testifying that "No. It happened to have been strictly I'm sitting at this table and this is right there and I noticed it."[28]

In September 2008, Sugar knew that the Regions debt was maturing, knew that there was not enough money to pay it, and knew that tenancy by the entireties ownership provided "more protection."[29] But Sugar maintained at trial that the decision to retitle the Brown Accounts had nothing to do with the Regions loans. Instead, Sugar claimed that "the two are totally unrelated" and "coincidence, strictly."[30]

In addition to the Brown Accounts, Debtor also held an individual account at BB&T (the "BB&T Account") prior to September of 2008. Like the Brown Accounts, Debtor opened the BB&T Account in his sole name and added Mrs. McCuan's name to the account in September 2008. On the date of the transfer, there was approximately $364,500.95 in the BB&T Account.[31] At deposition, Sugar testified that he had seen the BB&T Account statements in September 2008, while they were on the same table in Debtor's office with the Brown Account statements. But at trial Sugar testified that he learned about the BB&T Account after noticing the Brown Account statements and asking Debtor what other accounts were mistitled. Sugar ultimately testified at trial that he was not certain how the events occurred.[32]

The Court finds it extremely unlikely that the retitling of the Brown Accounts and the BB&T Account in the names of Debtor and Mrs. McCuan was a coincidence. The Court finds a more

---

[28] Doc. No. 322, June 5 Tr., pp. 274-75.
[29] Doc. No. 322, June 5 Tr., pp. 289, 291-94.
[30] Doc. No. 325, Sept. 12 Tr., pp. 46-49.
[31] Doc. No. 266, ¶ 13; Pls. Exs. 36, 37. According to the September 29, 2008 statement, the account balance as of August 28, 2008, was $387,000.95, and two withdrawals totaling $22,500.00 were made on August 29, 2008, so that the balance in the account as of September 2, 2008, was $364,500.95. Pls. Ex. 37, pp. 5-6.
[32] Doc. No. 324, Sept. 11 Tr., p. 194; Doc. No. 325, Sept. 12 Tr., pp. 89-90.

plausible explanation to be that in September 2008, Debtor and Sugar anticipated the defaults in Regions' loans and decided to retitle the accounts in order to protect them from execution by Regions.

### F.  Transfers After September 2008

On March 20, 2009, Debtor transferred $350,000.00 from Brown Account -2, and an additional $350,000.00 from Brown Account -1 to purchase three certificates of deposits ("CDs") at SunTrust:  (i) a $250,000.00 CD in the name of "W. Patrick McCuan or Jill McCuan" and James Gaylor; (ii) a $200,000.00 CD in MJF's name; and (iii) a $250,000.00 CD in the name of "Jill McCuan POD to W. Patrick McCuan" and "MDG Companies."[33]

Debtor was the general partner of MJF.[34] He testified that the proceeds of the MJF CD were used for "business purposes."[35] And Sugar testified that the proceeds of the two Jill McCuan/Patrick McCuan CDs were later deposited into Debtor and Mrs. McCuan's joint SunTrust account ending in -6962 ("SunTrust Account 6962").[36]

On July 22, 2009, Debtor transferred $44,000.00 from Brown Account -2 to a BB&T account held by McCuan Trust.[37] Debtor testified that the money was transferred to McCuan Trust because he "may have owed it to" McCuan Trust for an unspecified debt, but that he had not personally borrowed money from McCuan Trust.[38] Sugar testified that the money transferred to McCuan Trust was used to satisfy a loan for a car owned by Debtor and Mrs. McCuan, but the evidence shows that the car was purchased in Debtor's sole name in 2008, and was not retitled in the names of Debtor and Mrs. McCuan until December 2009, after the transfer to McCuan Trust was made.[39]

---

[33] Doc. No. 266, ¶ 15; Pls. Exs. 45, 46, 47.
[34] Defs. Ex. 33.
[35] Doc. No. 322, June 5 Tr., pp. 162-63.
[36] Doc. No. 324, Sept. 11 Tr., pp. 202-03.
[37] Pls. Ex. 30, p. 26.
[38] Doc. No. 322, June 5 Tr., pp. 163-64.
[39] Defs. Ex 45; Doc. No. 325, Sept. 12 Tr., p. 53.

On January 1, 2010, Debtor transferred his interest in an entity known as MDG-Patriot, LLC, to McCuan LLC.[40] According to Debtor's October 31, 2009 financial statement, Debtor's interest in MDG-Patriot, LLC, was valued at $78,000.00 at that time.[41] Sugar testified that Debtor received consideration for the transfer in the form of legal expenses paid by McCuan LLC; however, Sugar could not recall any records reflecting the payments or whether McCuan LLC paid any legal fees directly.[42]

On August 17, 2010, Debtor transferred $522,158.00 from Brown Account -1, and $449,377.55 from Brown Account -2 to a joint SunTrust account held by Debtor and Mrs. McCuan, and then to joint SunTrust Account 6962.[43]

On September 3, 2010, Debtor transferred $1,085,970.00 from Brown Account -1 to SunTrust Account 6962.[44]

Sugar testified that all of the Brown Account assets were ultimately transferred into SunTrust Account 6962.[45]

On May 18, 2011, $1,922,489.00 from SunTrust Account 6962 was used to satisfy the SunTrust line of credit.[46]

On September 26, 2011, Debtor transferred $100,000.00 from joint SunTrust Account 6962 to McCuan Trust.[47] Neither Debtor nor Sugar could recall the purpose of the transfer.[48]

---

[40] Doc. No. 266, ¶ 18.
[41] Doc. No. 266, ¶ 19.
[42] Doc. No. 322, June 5 Tr., pp. 227-29.
[43] Doc. No. 266, ¶ 20; Fraudulent Transfer Proceeding, Doc. No. 38, ¶ 23.
[44] Fraudulent Transfer Proceeding, Doc. No. 38, ¶ 24.
[45] Doc. No. 324, Sept. 11 Tr., p. 202.
[46] Doc. No. 266, ¶ 24.
[47] Fraudulent Transfer Proceeding, Doc. No. 38, ¶ 25.
[48] Doc. No. 322, June 5 Tr., pp. 251-52.

On January 13, 2012, Debtor transferred $100,000.00 from SunTrust Account 6962 to K&M.[49] Sugar did not know the reason for the transfer, but testified that it was probably for business purposes.[50]

On January 27, 2012, Debtor transferred $91,575.00 in cash and $658,682.00 in other assets from joint SunTrust Account 6962 to an account held by McCuan Trust.[51] Debtor and Sugar initially testified that they did not know the purpose of the transfer. Defendants later objected to the introduction of any evidence related to McCuan Trust.[52]

In summary, Mrs. McCuan was added as an owner of the Brown Accounts in September 2008. In 2009, Debtor transferred funds from the (now) joint Brown Accounts to MJF and to McCuan Trust. In 2010, Debtor transferred funds from the Brown Accounts to SunTrust Account 6962, and all of the Brown Account assets were ultimately transferred to SunTrust Account 6962. In 2011, Debtor transferred funds from SunTrust Account 6962 to McCuan Trust and to K&M. Debtor was the general partner of MJF, a co-trustee of McCuan Trust, and president of K&M at the time of the transfers. The Court therefore finds that Debtor maintained direct or indirect control over the assets after the transfers were made.

G.    The Proceedings

On November 18, 2013, the state court in the Lake Trafford Action entered an order allowing Regions to pursue a proceeding supplementary under § 56.29 of the Florida Statutes.[53]

On January 29, 2014, Debtor filed a petition under Chapter 7 of the Bankruptcy Code. On May 8, 2014, the state court proceeding supplementary was removed to this Court (the "56.29

---

[49] Fraudulent Transfer Proceeding, Doc. No. 38, ¶ 26.
[50] Doc. No. 322, June 5 Tr., pp. 252-53.
[51] Fraudulent Transfer Proceeding, Doc. No. 38, ¶ 27.
[52] Doc. No. 322, June 5 Tr., pp. 253-64.
[53] Doc. No. 266, ¶ 28.

Proceeding"). In the 56.29 Proceeding, Plaintiffs assert that transfers were made by Debtor with the intent to hinder, delay, or defraud Regions.[54] Under § 56.29(3)(a) of the Florida Statutes, the look-back period for the avoidance of a transfer is one year prior to the service of the summons and complaint on the transferor in the underlying action. Because Debtor was served with the summons and complaint in the Lake Trafford Action on April 13, 2009, the look-back date in the 56.29 Proceeding is April 13, 2008.

On August 27, 2015, the Court dismissed certain of Plaintiffs' claims in the 56.29 Proceeding, determining in part that it lacked jurisdiction as to the claims regarding the Brown Accounts because Brown is located in Maryland.[55] However, the Court later reconsidered its ruling, and determined that it has jurisdiction under § 56.29 to enter judgments against Defendants to the extent that they received transfers of assets from the Brown Accounts.[56]

On January 29, 2016, after the Court dismissed the claims in the 56.29 Proceeding, but before the Court reconsidered its ruling, the Trustee commenced the Fraudulent Transfer Proceeding. In the Fraudulent Transfer Proceeding, the Trustee seeks to avoid the transfer of assets from the Brown Accounts to Defendants as intentionally and constructively fraudulent transfers under § 544(b) of the Bankruptcy Code and the Florida Uniform Fraudulent Transfer Act ("FUFTA"). The Trustee's complaint alleges that "any assertion of TBE ownership [of the Brown Accounts] would fail as a matter of law because the addition of Mrs. McCuan to an account already owned by the Debtor did not have the unity of time and/or other unities required to establish TBE ownership."[57]

Defendants filed a motion to dismiss the Fraudulent Transfer Proceeding. They asserted in part that the Brown Accounts became tenancy by the entireties ("TBE") property when Mrs. McCuan

---

[54] 56.29 Proceeding, Doc. Nos. 9 and 60.
[55] 56.29 Proceeding, Doc. No. 123.
[56] 56.29 Proceeding, Doc. No. 218.
[57] Fraudulent Transfer Proceeding, Doc. No. 1, ¶ 21.

was added in September 2008 (which was outside FUFTA's four-year look-back period), so that the subsequent transfers of Brown Account assets were not avoidable.[58] On April 28, 2016, the Court dismissed the Fraudulent Transfer Proceeding with prejudice, on the ground that "the addition of a spouse to an existing account satisfies the six unities" of TBE ownership.[59] The District Court reversed, holding that the factual allegations in a complaint must be viewed in the light most favorable to the plaintiff when evaluating a motion to dismiss, and that the record before the Bankruptcy Court at that time did not establish that the Brown Accounts had been converted to TBE property.[60] The District Court remanded the Fraudulent Transfer Proceeding back to this Court.

In the Fraudulent Transfer Proceeding, Defendants contend, among other defenses, that the Brown Accounts were funded with funds originally held by Debtor and Mrs. McCuan as tenants by the entireties, so that the September 2008 retitling of the accounts to Debtor and Mrs. McCuan was neither fraudulent nor avoidable.[61]

The Proceedings were tried on June 5, September 11-12, and October 15, 2018.

During the trial, on September 11, 2018, Defendants filed a *Motion for Judgment on Partial Findings* pursuant to Rule 52(c) of the Federal Rules of Civil Procedure (the "Motion").[62] In the Motion, Defendants request judgment in their favor on two counts of the Fraudulent Transfer Proceeding and all claims in the 56.29 Proceeding "as they relate to those transactions that are properly considered conversions under § 222.30, Fla. Stat., and not 'fraudulent transfers' pursuant to

---

[58] Fraudulent Transfer Proceeding, Doc. No. 4.
[59] Fraudulent Transfer Proceeding, Doc. No. 17, p. 9; Doc. No. 19.
[60] *In re McCuan*, 569 B.R. 511 (M.D. Fla. 2017).
[61] Doc. No. 316.
[62] Doc. No. 293.

§ 726.105, *Fla. Stat*." Because the Court is issuing these Findings of Fact and Conclusions of Law based on the totality of the evidence presented at trial, the Motion should be denied.[63]

In their post-trial submissions, Plaintiffs seek judgments against Defendants as follows:[64]

1.      A judgment against Mrs. McCuan in the amount of $2,104,709.00, based on the value of Brown Accounts -1 and -2 when she was added to the Accounts on September 8, 2008.

2.      A judgment against Mrs. McCuan in the amount of $654,341.00, based on the value of Brown Account -9 when she was added to the Account on September 8, 2008.

3.      A judgment against Mrs. McCuan in the amount of $387,000.00, based on the value of the BB&T Account when she was added to the Account on September 2, 2008.

4.      A judgment against MJF in the amount of $200,000.00, based on the transfer of Brown Account assets to MJF on March 9, 2009.

5.      A judgment against McCuan Trust in the amount of $44,000.00, based on the transfer of Brown Account assets to McCuan Trust on July 22, 2009.

6.      A judgment against McCuan LLC in the amount of $78,000.00, based on the transfer of the Debtor's interest in MDG-Patriot, LLC, to McCuan LLC on January 1, 2010.

7.      A judgment against McCuan Trust in the amount of $100,000.00, based on the transfer of that amount from SunTrust Account 6962 to McCuan Trust on September 26, 2011.

8.      A judgment against K&M in the amount of $100,000.00, based on the transfer of that amount from SunTrust Account 6962 to K&M on January 13, 2012.

9.      A judgment against McCuan Trust in the amount of $750,256.85, based on the transfer of assets in that amount from SunTrust Account 6962 to McCuan Trust on January 27, 2012.

---

[63] *Belen Jesuit Preparatory School v. Sportswear, Inc.*, No. 1:15-cv-22194-UU, 2016 WL 4718165 (S.D. Fla. June 29, 2016); *In re Otero County Hospital Ass'n, Inc.*, No. 11-11-13686JL, 2016 WL 7985365, at *12 (Bankr. D.N.M. Dec. 23, 2016).
[64] Doc. No. 317, pp. 51-52.

## CONCLUSIONS OF LAW

**A.     The Brown Accounts were not funded with TBE assets.**

Defendants assert that the Brown Accounts were funded with assets held by Debtor and Mrs. McCuan as tenants by the entireties, and that the transfers from the Brown Accounts therefore are not fraudulent or voidable as a matter of law.[65] Specifically, Defendants claim that the Brown Accounts were funded with distributions from K&M and an entity known as MDG Companies of Naples, Inc. ("MDG Naples"). According to Defendants, (i) Debtor and Mrs. McCuan held their interests in K&M and MDG Naples as TBE property, (ii) all distributions from the entities retained their TBE character after they were deposited into the Brown Accounts, and (3) Mrs. McCuan's name was added to the Brown Accounts only to reflect the existing TBE ownership.

The Court finds that the evidence does not establish that the Brown Accounts were funded with TBE assets.

### 1.     K&M and MDG Naples

First, the evidence does not show that K&M and MDG Naples were held by Debtor and Mrs. McCuan as TBE assets. The stock certificates and financial statements presented at trial do not satisfactorily evidence the TBE ownership.

With respect to K&M, for example, Defendants introduced a document as K&M stock certificate "Number -005," issued on January 15, 1994 to "Jill and Patrick McCuan, Tenants by the Entireties."[66] But K&M was incorporated in 1977, and Debtor acquired his initial interest in K&M before 1994.[67] No evidence was presented to show whether Debtor actually transferred his stock to himself and Mrs. McCuan in 1994, or whether the original stock was cancelled and new stock issued

---

[65] Doc. No. 316, pp. 20-23.
[66] Defs. Ex. 23.
[67] Doc. No. 323, Sept. 11 Tr., pp. 98-99.

in joint names. Further, K&M's stock book is not in evidence to show how the stock was documented in the company's records.

With respect to MDG Naples, Defendants introduced a stock certificate dated February 9, 1994, issued to "Patrick and Jill McCuan."[68] The stock certificate resembles the certificate submitted with respect to K&M, and states that MDG Naples is "incorporated under the Laws of the State of Maryland," even though MDG Naples is a Florida entity. Also, the stock certificate does not include a notation concerning MDG Naples' subchapter S status, as required by the company's Articles of Incorporation.[69]

As with the stock certificates, Debtor's financial statements are also insufficient to evidence the TBE ownership of K&M and MDG Naples. For a number of years, Debtor submitted segregated financial statements to Regions indicating that K&M and MDG Naples were not TBE assets. In February 2007, for example, Sugar sent Regions a segregated financial statement dated October 31, 2006, to identify assets that were "Pat only," and the segregated statement indicated that Debtor separately held a 95% share of K&M.[70] The financial statements dated August 31, 2002, and August 31, 2005, also reflect that Debtor held a 95 percent segregated interest in K&M.[71]

Similarly, the financial statements submitted to Regions for the years between 2002 and 2007 expressly state that "W. Patrick McCuan owns 100% of the common stock of MDG Companies of Naples, Inc."[72] The first time that a financial statement reflected joint ownership of MDG Naples was in October 2008,[73] at approximately the same time that payments stopped being made on the Regions debt.

---

[68] Defs. Ex. 25.
[69] Pls. Ex. 62, pp. 5-6.
[70] Pls. Ex. 7.
[71] Pls. Ex. 12.
[72] Defs. Exs. 6-11.
[73] Defs. Ex. 12.

Under these circumstances, the Court finds that the stock certificates and financial statements do not sufficiently show that Debtor and Mrs. McCuan held an interest in K&M and MDG Naples as TBE property prior to 2008.

### 2.    Unities

Second, the evidence does not show that the Brown Accounts possessed the unities required for TBE property.

In Florida, property held as TBE must possess six unities, meaning that (1) the property must be jointly owned and controlled, (2) the interests in the property must be identical, (3) the interests must have originated from the same instrument, (4) the interests must have commenced simultaneously, (5) the parties must have the right of survivorship, and (6) the parties must be married when they jointly acquired the property.[74]

The required unities were not present with respect to the Brown Accounts. Debtor opened the Brown Accounts in his own name in 2001,[75] and had sole control over the funds until Mrs. McCuan was added to the accounts in 2008. In 2005, Debtor arranged for $1.2 million to be transferred to Brown from his individual Merrill Lynch account.[76] In 2008, Debtor represented to SunTrust that he was the sole owner of Brown Accounts -1 and -2, and that he had the unrestricted right to grant a security interest in the accounts.[77] And Debtor acknowledged in testimony that as of June 30, 2008, Brown Account -1 was "his individual asset," as reflected on an account statement.[78] Even if the Court were to find that the September 2008 retitling of the Brown Accounts effectuated TBE ownership, the retitling took place within the look-back period of § 56.29 of the Florida Statutes.

---

[74] *Beal Bank, SSB v. Almand and Associates*, 780 So. 2d 45, 52 (Fla. 2001).
[75] Doc. No. 266, ¶ 11.
[76] Pls. Ex. 17.
[77] Pls. Ex. 53.
[78] Doc. No. 322, June 5 Tr., p. 151.

### 3.      Tracing

Third, the evidence does not show that the funds in the Brown Accounts in September 2008 are traceable to TBE assets.

For example, Defendants contend that an entity known as Dobbin Square Limited Partnership was a TBE property. According to Defendants, a $100,000.00 "replacement check" deposited into Brown Account -2 in October 2003 is traceable to an $893,000.00 deposit into Debtor's individual Merrill Lynch account in May 2003 from Dobbin Square.[79] However, when the $893,000.00 was deposited to the Debtor's Merrill Lynch account, the account already contained the approximate sum of $600,000.00, so that the $100,000.00 transfer from the Debtor's Merrill Lynch account to Brown Account -2 cannot be traced to the deposit from Dobbin Square.

Likewise, Defendants introduced excerpts from the Brown Account statements for October 2003, January 2005, February 2005, and January 2006, claiming that these excerpts show that distributions from TBE companies were deposited into the Brown Accounts during those months.[80] But the intervening statements (from November 2003 to December 2004 and March to December 2005) were not offered as evidence. The Court cannot find that the funds on deposit in the Brown Accounts as of September 2008 are traceable to deposits from TBE companies, as those deposits could have been withdrawn, replaced, or mingled with other non-TBE funds. In fact, Debtor acknowledged that he did not know whether the money from K&M or MDG Naples was still in the Brown Accounts when Mrs. McCuan was added as joint tenant in 2008, or whether other money had been deposited into the accounts in the interim.[81]

---

[79] Defs. Ex. 28; Doc. No. 324, Sept. 11 Tr., pp. 166-69.
[80] Defs. Exs. 28, 29.
[81] Doc. No. 322, June 5 Tr., pp. 186-91.

In summary, the evidence does not show that the Brown Accounts were funded with TBE property, or that the funds in the Brown Accounts in September 2008 are traceable to TBE assets. Accordingly, the Court cannot find that the subsequent transfers from the Brown Accounts constitute transfers of TBE assets that are not avoidable as a matter of law.

### B.    Defendants bear the burden of proof under § 56.29.

Plaintiffs seek judgment against Defendants under §§ 56.29 and 726.105(1)(a) of the Florida Statutes, and claim that the transfers identified at trial were made with actual intent to hinder, delay, or defraud Regions. The claims under § 56.29 and § 726.105(1) entail the same analysis, so the Court considers them together.

"Proceedings supplementary are equitable in nature," and "Florida courts have consistently held that § 56.29 must be given a liberal construction in order to afford a judgment creditor the most complete relief possible."[82] With respect to the burden of proof to establish an alleged fraudulent transfer, § 56.29(3)(a) provides:

> When, within 1 year before the service of process on the judgment debtor in the original proceeding or action, the judgment debtor has had title to, or paid the purchase price of, any personal property to which the judgment debtor's spouse, any relative, or any person on confidential terms with the judgment debtor claims title and right of possession, *the judgment debtor has the burden of proof to establish that such transfer or gift was not made to delay, hinder, or defraud creditors.*[83]

In other words, § 56.29 provides that a judgment debtor bears the burden of proving that a transfer was not fraudulent, if a person close to him currently claims title to or possession of the transferred property. But "in the context of the statute, [this reference to the burden of proof] must include not only the judgment debtor but any transferee who has been impleaded as a defendant."[84]

---

[82] *Kearney Constr. Co., LLC v. Travelers Casualty & Surety Co. of America*, No. 8:09-cv-1850-T-30TBM, 2017 WL 942118, at *10 (M.D. Fla. Feb. 10, 2017), *report and recommendation adopted*, 2017 WL 933569 (M.D. Fla. Mar. 9, 2017), *aff'd*, 712 F. App'x 907 (11th Cir. 2017).

[83] Fla. Stat. § 56.29(3)(a)(emphasis added).

[84] *Morton v. Cord Realty, Inc.*, 677 So. 2d 1322, 1324 (Fla. 4th DCA 1996).

Consequently, in a proceeding supplementary, the judgment debtor and impleaded defendants bear the burden of proving that a transfer was not made to hinder, delay, or defraud creditors, if the transferred assets were owned by the judgment debtor "within 1 year before the service of process" in the original action.[85]

In this case, Regions served Debtor with process in the Lake Trafford Action on April 13, 2009.[86] Under § 56.29, therefore, the one-year look-back period applies to transfers that occurred after April 13, 2008. Mrs. McCuan was added to the Brown Accounts and the BB&T Account in September 2008,[87] within the one-year period.

"Whether a defendant's actions are made or contrived to 'delay, hinder, or defraud' can be determined with reference to section 726.105(1)" of FUFTA, which "identifies what transactions are fraudulent and contains a non-inclusive list of 11 factors that are indicia of fraud."[88] The eleven factors or "badges of fraud" are:

(1)      Whether the transfer or obligation was to an insider.

(2)      Whether the debtor retained possession or control of the property transferred after the transfer.

(3)      Whether the transfer or obligation was disclosed or concealed.

(4)      Whether the debtor had been sued or threatened with suit before the transfer was made or the obligation was incurred.

(5)      Whether the transfer was of substantially all the debtor's assets.

(6)      Whether the debtor absconded.

(7)      Whether the debtor removed or concealed assets.

---

[85] *RREF SNV-FL SSL, LLC v. Shamrock Storage, LLC*, 178 So. 3d 90, 92 (Fla. 1st DCA 2015).
[86] Doc. No. 266, ¶ 17.
[87] Doc. No. 266, ¶¶ 13, 14.
[88] *Kearney*, 712 F. App'x at 911-12(citations omitted.).

(8)     Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.

(9)     Whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.

(10)     Whether the transfer occurred shortly before or shortly after a substantial debt was incurred.

(11)     Whether the debtor transferred the essential assets of a business to a lienor who transferred the assets to an insider of the debtor.[89]

"These badges of fraud create a prima facie case and raise a rebuttable presumption that the transfer is void."[90] But because "consideration may be given to factors other than those listed," a reviewing court "may take into account the circumstances surrounding the conveyance."[91]

Generally, the same factors determine whether a transfer was made with intent to hinder, delay, or defraud creditors under § 56.29 and § 726.105, and the only distinction for purposes of this case is the burden of proof. The Trustee must prove that the transfers were made with fraudulent intent in the Fraudulent Transfer Proceeding, and Defendants must prove that the transfers were not made to hinder, delay, or defraud creditors in the 56.29 Proceeding.

**C.     The transfers were made with actual fraudulent intent.**

Regardless of the relative burdens of proof, the Court finds that the circumstances surrounding Debtor's transactions show that the transfers in this case were made with fraudulent intent. "While a single badge of fraud may amount only to a suspicious circumstance, a combination of badges will justify a finding of fraud."[92] In this case, a number of factors are present which indicate fraud:

---

[89] Fla. Stat. § 726.105(2).
[90] *Kearney*, 2017 WL 942118, at *10.
[91] *Kearney*, 712 F. App'x at 912(quoting *Mejia v. Ruiz*, 985 So. 2d 1109, 1113 (Fla. 3d DCA 2008)).
[92] *Kearney*, 2017 WL 942118, at *10(quoting *Mejia v. Ruiz*, 985 So. 2d at 1113).

1.      The transfers were made to insiders of Debtor. Specifically, the transfers were made to Debtor's wife, MJF, McCuan Trust, McCuan LLC, and K&M. Debtor was the general partner of MJF, a co-trustee of McCuan Trust, the general manager of McCuan LLC, and president of K&M.

2.      Debtor maintained control of the assets after the transfers. The transfers began in September 2008, with the addition of Mrs. McCuan to Debtor's Brown Accounts and the BB&T Account. Mrs. McCuan testified in a deposition that she was not involved in managing the Brown Accounts, that she did not direct any disbursements from the accounts, that she did not recall why any of the transactions had been made, and that she had never seen any statements from the accounts.[93] Although Mrs. McCuan later testified at trial that she understood the Brown Accounts to hold retirement funds and that she had made decisions with respect to the investments,[94] the Court gives this testimony little weight in view of its conflict with her earlier testimony. And Debtor generally controlled the assets as officer or manager of the entities that received the transfers. On June 13, 2011, for example, Debtor authorized the payments on his residential mortgage to be made from an account held by McCuan Trust.[95]

3.      The transfers were concealed. In the course of the dispute between Regions and Debtor, for example, Debtor "blocked and objected" to the production of "everything having to do with the [T]rust."[96]

4.      The transfers divested Debtor of significant non-exempt assets. In his October 31, 2007 financial statement, Debtor listed a 100% ownership in cash and cash equivalents worth $4,481,178.00, and corporate interests worth $10,234,074.00.[97] But a year later, after the loan from

---

[93] Doc. No. 323, Sept. 11 Tr., pp. 34-39.
[94] Doc. No. 325, Sept. 12 Tr., pp. 159-60.
[95] Pls. Ex. 67.
[96] *See* Doc. No. 322, June 5 Tr., pp. 253-64.
[97] Pls. Ex. 8.

Regions was in default, Mrs. McCuan, McCuan Trust, and other Debtor-controlled entities held an interest in the assets.

5.    Defendants acknowledge that Debtor was insolvent no later than May or June 2011, which was before many of the transfers occurred, and shortly after other transfers had occurred. Regions obtained five judgments against Debtor between May and June 2011, and the judgments were in an aggregate amount that exceeded $14 million.

6.    Debtor added Mrs. McCuan to the Brown Accounts and the BB&T Account in September 2008, when the default on the Regions debt was imminent. Specifically, Debtor and Sugar met with Regions that same month to discuss restructuring the Regions debt, and unsuccessfully proposed a restructuring plan for the loans.

Sugar's testimony supports the Court's finding that the Brown Accounts were retitled with the intent to hinder, delay, or defraud Regions. Prior to 2008, Sugar was familiar with certain tax forms indicating that the Brown Accounts were held solely by Debtor, and he sent segregated financial statements to Regions identifying the Brown Accounts as belonging to Debtor.[98] But according to his testimony, he did not decide that Mrs. McCuan should be added to the Brown Accounts until September 2008. At that time, Sugar knew that the Regions debt was scheduled to mature and that the borrowers would be unable to pay the debt. Sugar also knew that a TBE ownership would offer more protection to Debtor. Under these circumstances, the Court gives little weight to Sugar's testimony that it was only coincidence that Mrs. McCuan's name was added to the Brown Accounts and the BB&T Account shortly before Debtor defaulted on the Regions debt. Instead, the totality of the circumstances show that Mrs. McCuan's name was added to the Brown Accounts and the BB&T Account to hinder, delay, or defraud Regions.

---

[98] *See, e.g.,* Pls. Ex. 7.

In summary, Plaintiffs established by a preponderance of the evidence that Debtor made the September 2008 transfers and the later transfers with intent to hinder, delay, or defraud Regions, and Defendants did not meet their burden under § 56.29 of proving that the transfers were not made with fraudulent intent.

**D.    The transfers were constructively fraudulent.**

Under FUFTA, in addition to intentional fraud, a transfer is fraudulent as to a creditor if the transfer is made:

> Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>
> 1.  Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>
> 2.  Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.[99]

In this case, the transfers were made while Regions was about to pursue, or had already obtained, judgments against Debtor that exceeded $14 million. Further, Debtor and Sugar testified that Debtor was in poor financial condition at the time of the transfers, and Defendants acknowledge that Debtor was insolvent no later than mid-2011. Based on these factors, the Court finds that the Trustee has established the insolvency prong of § 726.105(1)(b).

The Court also finds that Debtor did not receive reasonably equivalent value in exchange for the transfers. Debtor testified that Mrs. McCuan gave no consideration in exchange for having her name added to the Brown Accounts.[100]

Additionally, the evidence does not show that the transfers were made to McCuan Trust and related entities in exchange for the entities' repayment of a line of credit owed by Debtor, rather than

---

[99] Fla. Stat. § 726.105(1)(b).
[100] Doc. No. 322, June 5 Tr., p. 154.

to repay funds borrowed by McCuan Trust.[101] And Sugar testified at trial that Debtor transferred funds to McCuan Trust in consideration of McCuan Trust's payments on a line of credit, but at a pre-trial deposition he had testified that the transfer was only a "temporary disbursement."[102]

The evidence shows that the transfers were constructively fraudulent under § 726.105(1)(b) of the Florida Statutes.

### E.   It is inequitable to enter judgment against Mrs. McCuan.

Plaintiffs seek to avoid Debtor's September 2008 retitling of the Brown Accounts and the BB&T Account to add Mrs. McCuan as a tenant by the entireties, and the Court has found that Debtor added Mrs. McCuan to the Brown Accounts and the BB&T Account with intent to hinder, delay, or defraud Regions. But apart from her becoming a legal owner of the accounts, there is no evidence before the Court of fraudulent intent by Mrs. McCuan, and no evidence that she ever exercised any control over the assets in the accounts either while they were maintained at Brown or BB&T, or when funds from the accounts were transferred to other joint accounts, such as the SunTrust account.

The Court recognizes the general rule that the avoidance of a transfer to a debtor's spouse results in the spouse's liability for the full value of the property transferred. In a § 56.29 proceeding regarding a transfer of stock from a husband to the husband and his wife, for example, the court held that the creditor was entitled to void the transfer and recover all of the stock.[103]

Courts have made similar rulings in avoidance actions under § 548 of the Bankruptcy Code.[104] For example, a series of cases arising from the break-up of a Philadelphia law firm involved wage deposits from the debtors (partners in the law firm) to TBE accounts with their wives. In those cases, courts held that the deposits could be avoided as constructively fraudulent transfers, but that the

---

[101] Doc. No. 325, Sept. 12 Tr., pp. 130-31.
[102] Doc. No. 325, Sept. 12 Tr., pp. 123, 130-31; Doc. No. 322, June 5 Tr., p. 241.
[103] *Puleo v. Golan*, 201 So. 3d 37 (Fla. 3d DCA 2014).
[104] *In re Laines*, 352 B.R. 397 (Bankr. E.D. Va. 2005); *In re Page*, 240 B.R. 548 (Bankr. W.D. Mich. 1999).

transfers could only be recovered against the debtors and their wives to the extent that the deposited funds were not spent on "necessities."[105]

The avoidance of a fraudulent transfer from a debtor to himself and his spouse appears straightforward if the property transferred is tangible real or personal property. For example, if a debtor owns Blackacre in his own name and transfers title to himself and his wife as TBE within the avoidance period, the trustee may avoid the transfer and recover the entirety of Blackacre for the benefit of the bankruptcy estate.

But if, as here, the property transferred is an intangible asset (such as a bank account or an investment account) and the non-debtor spouse did not take any control of the asset, even for "necessities," it is difficult for the Court to envision entering a judgment against the non-debtor spouse, no matter how ill-intentioned the debtor was, for the value of accounts transferred.

In this case, Plaintiffs themselves have asserted:

> The Debtor continued to exercise control over the Brown accounts after Mrs. McCuan was added to them; as discussed below, Mrs. McCuan testified that she had nothing whatsoever to do with managing these assets after her name was added to the accounts. In short, as to each transfer, the Debtor maintained direct or indirect control over the assets transferred. Further, the transferred assets were used for the Debtor's direct or indirect benefit.[106]
>
> . . .
>
> The evidence here shows that the Debtor had sole control over the assets until Mrs. McCuan was added to the Brown accounts in September 2008, and is the only person that actually exercised control over the Brown assets even after her name was added.[107]
>
> . . .
>
> Mrs. McCuan's deposition concerning her knowledge of, and control over, the Brown accounts shifted sharply between her deposition and trial, suggesting that she first formed any intent with respect to ownership of these assets years after the fact, in

---

[105] *In re Titus*, 916 F.3d 293 (3d Cir. 2019); *In re Wettach*, 811 F.3d 99 (3d Cir. 2016); *In re Arbogast*, 466 B.R. 287 (Bankr. W.D. Pa. 2012).
[106] Doc. No. 317, p. 16.
[107] Doc. No. 317, p. 36.

defense of this suit. When asked at deposition whether she had an ownership interest in the Brown accounts in June 2008 Mrs. McCuan testified: "I don't believe so. I don't know." She testified at deposition that the <u>only</u> information she had about the Brown accounts was received from the Debtor, Sugar, or her attorneys; she could not recall meeting with anyone from Brown when the accounts were retitled, and testified that she was not involved in managing the accounts at all. Mrs. McCuan testified in her deposition that she did not direct any disbursements from the Brown accounts, did not know or could not recall why any of the transfers at issue in this case had been made, could not recall any information about the SunTrust line of credit (which the Brown assets were pledged to secure), had never seen any of the statements for any accounts that housed the assets from Brown, and agreed that she [] "certainly" was not involved in managing the accounts.[108]

Plaintiffs' assertions reflect their acknowledgement that Mrs. McCuan exercised little or no control over the Brown Accounts and the BB&T Account after the accounts were retitled.

In addition, with respect to the means of carrying out the purpose of a proceeding supplementary, § 56.29(6) provides in part:

> (6) The court may order any property of the judgment debtor . . . in the hands of or under the control of any person subject to the Notice to Appear, to be levied upon and applied toward the satisfaction of the judgment debt. The court may enter any orders, judgments, or writs . . . including entry of money judgments as provided in ss. 56.16-56.19 against any person to whom a Notice to Appear has been directed and over whom the court obtained personal jurisdiction irrespective of whether such person has retained the property, *subject to applicable principles of equity* . . . .[109]

The majority of the cases that discuss "principles of equity" under § 56.29 do so in the context of the statute's mandate that it be liberally construed for the benefit of the judgment creditor.[110] But the language of § 56.29 refers only to "principles of equity," without specifying that those principles apply only to the judgment creditor.

---

[108] Doc. No. 317, p. 37(citing Doc. No. 323, Sept 11 Tr., pp. 33-35, 39-51).
[109] Fla. Stat. § 56.29(6)(emphasis supplied).
[110] *See Planet Bingo, LLC v. Wild Bill's Bingo, Inc.*, No. 5:10-cv-64-RS-CJK, 2015 WL 7251259 (N.D. Fla. Jan. 13, 2015); *Biel Reo, LLC v. Barefoot Cottages Development Co., LLC*, 156 So. 3d 506 (Fla. 1st DCA 2014).

Black's Law Dictionary defines equity as denoting "the spirit and the habit of fairness, justness, and right dealing . . . ."[111] In the context of evaluating a fraudulent transfer recipient's assertion of the mere conduit defense under § 548 of the Bankruptcy Code, two courts have stated that the defense is " 'based on, and defined by, equity,' requir[ing] the Court to take 'a flexible, pragmatic, equitable approach,' considering a transaction in its entirety, rather than focusing in on the particular transfer in question."[112]

Here, applying a "spirit of fairness, justness, and right dealing," and taking a "flexible, pragmatic, equitable approach," the Court finds, on the specific facts presented, and considering the transactions between Debtor and Mrs. McCuan in their entirety, that it would be inequitable to enter judgment against Mrs. McCuan for the value of the assets in the Brown Accounts as of September 2008, which was calculated as $2,759,050.00, or the value of the BB&T Account as of September 2008, which was calculated as $387,000.00.

Consequently, with respect to Plaintiffs' claims against Mrs. McCuan, judgment should be entered in favor of Defendant, Jill McCuan, and against Plaintiffs.

**F.     Plaintiffs are entitled to judgment against MJF, McCuan Trust, and K&M.**

Plaintiffs seek the entry of a judgment against MJF based on the transfer of Brown Account assets to MJF on March 9, 2009. Plaintiffs seek the entry of a judgment against McCuan Trust based on the transfer of Brown Account assets to McCuan Trust on July 22, 2009, and based on transfers from the SunTrust account on September 26, 2011, and January 27, 2012. And Plaintiffs seek the entry of a judgment against K&M based on a transfer from the SunTrust account on January 13, 2012.

---

[111] The Law Dictionary featuring Black's Law Dictionary Free Online Legal Dictionary 2d Ed.
[112] *In re Rollaguard Sec., LLC*, 591 B.R. 895, 911 (Bankr. S.D. Fla. 2018)(quoting *In re Harwell*, 628 F.3d 1312, 1322 (11th Cir. 2010)).

In Sections C and D above, the Court found that the transfers were made with actual fraudulent intent and that the transfers were constructively fraudulent. Accordingly, the transfers are avoidable under § 56.29(3) and § 726.108 of the Florida Statutes, and the transferred assets are subject to execution to satisfy the debt owed by Debtor.[113] The execution is subject to SunTrust's lien on Brown Accounts -1 and -2.[114]

Consequently, judgment should be entered in favor of Plaintiffs, and against Defendant MJF in the amount of $200,000.00 on account of the March 9, 2009 transfer.

Judgment should be entered in favor of Plaintiffs, and against Defendant McCuan Trust, in the amount of $44,000.00 on account of the July 22, 2009 transfer.

Judgment should be entered in favor of Plaintiffs, and against Defendant McCuan Trust, in the amount of $100,000.00 on account of the September 26, 2011 transfer.

Judgment should be entered in favor of Plaintiffs, and against Defendant McCuan Trust, in the amount of $750,256.85 on account of the January 27, 2012 transfer.

And judgment should be entered in favor of Plaintiffs, and against Defendant K&M in the amount of $100,000.00 on account of the January 13, 2012 transfer.

## G.    Plaintiffs are entitled to judgment against McCuan LLC.

Finally, Plaintiffs seek the entry of a judgment against McCuan LLC based on the transfer of Debtor's interest in MDG-Patriot, LLC, to McCuan LLC on January 1, 2010. For the reasons explained in this opinion, the transfer is avoidable as an actually and constructively fraudulent transfer. Additionally, the Court finds that the entry of a judgment against McCuan LLC, under § 726.108 is the appropriate remedy, rather than the remedy provided by § 605.0503 of the Florida

---

[113] Fla. Stat. §§ 56.29(3), (6), and 726.108(1), (2).
[114] Pls. Ex. 53; Doc. No. 317, pp. 42-43.

Statutes, because "no law . . . permits fraudulently transferring with impunity an interest in an LLC."[115]

Accordingly, judgment should be entered in favor of Plaintiffs, and against McCuan LLC in the amount of $78,000.00 on account of the transfer on January 1, 2010.

### H.    Judgments

Plaintiffs are hereby directed to submit judgments in accordance with the foregoing.

The Clerk's office is directed to serve a copy of this order on interested parties via CM/ECF.

---

[115] *Regions Bank v. Kaplan*, No. 8:16-cv-2867-T-23AAS, 2018 WL 3954344, at *4 (M.D. Fla. Aug. 17, 2018)(Appeal pending, Eleventh Circuit Court of Appeals, Case No. 18-14010).